## Alexander Estate

*John E. Costello*, for accountant.
*Arnold W. Hirsch,* for claimant.

FRANKS, *J.*, February 8, 1978—The question before this court involves the proper distribution of the estate of Albert F. Alexander, also known as A. F. Alexander, who died testate on March 25, 1977, in view of the codicil to his last will and testament executed August 10, 1976. Mary A. Murphy, his sister, timely filed a statement of claim against the proposed schedule of distribution claiming that she ought to receive 50 percent of the residue rather than nothing as set forth under the proposed schedule of distribution.

The critical language under contention is the language from the codicil which reads: "In the event that my sister, Mary Murphy, of Aberdeen, North Carolina, is admitted to a nursing home I wish to change her share of my estate which was to have been 50% to nothing. . . ." More precisely, the contentions involve the proper construction of the term "nursing home."

Claimant, Mary A. Murphy, urges this court to construe "nursing home" in the plain, ordinary, and generally accepted denotation thereof.

In opposition to claimant's claim, the estate urges upon this court the contention, supported by an offer of proof,[1] that it is the subjective intention of the testator which controls, and that the testator

---

1. Shelby Ferguson testified: 1. that he was the scrivener of the codicil, and 2. that the testator at that time had knowledge of the particular home in which claimant resided at the time of decedent's death. In addition, the estate sought to show the testator's intent, relying upon the testimony of the claimant that she had knowledge of the contents of testator's codicil and sought to have him rewrite the codicil.

in fact had in mind the meaning usually and ordinarily associated with the term "retirement home," and that the term "nursing home" ought to be construed to include this connotation.

## DISCUSSION

This court recognizes the general rule that the object of the inquiry is to ascertain the intent of the testator: Duld Estate, 389 Pa. 108, 132 A. 2d 247 (1957); Tripp Estate, 402 Pa. 211, 166 A. 2d 619 (1961). In doing so no canon of construction or extrinsic evidence is apposite when, from the four corners of the will, the court can feel confidence in distributing the estate: Soles Estate, 451 Pa. 568, 304 A. 2d 97 (1973). To determine the meaning of the words used by the testator in his will, the law accords to the words actually used a presumption that they are used in their ordinary and plain signification:[2] Sommerville Estate, 417 Pa. 600, 209 A. 2d 299 (1965); Dravo Estate, 388 Pa. 551, 131 A. 2d 351 (1957); Reagan Estate, 25 Fayette 164 (1962).

The testimony of the scrivener of the codicil in this instance was to the effect that in using the term "nursing home" the testator in fact had in mind "this specific home," that is, the "Methodist Retirement Home, Inc.," where claimant resided at the time of the testator's death.

"In interpreting a will or deed, and considering admissibility of evidence in aid of construction, a fundamental distinction exists between oral declarations by testator or grantor which *contradict or*

---

2. Elementarily, a presumption is not a canon of construction.

*vary* the written devise, bequest or grant, and those which, when the written words are *equivocal or ambiguous*, merely *identify* the gift or grant and reveal the *intent* with respect thereto. In the former case the oral testimony would compete with and overthrow the written words. In a *will* this would permit parol testimony to constitute a will, which is prohibited by the Wills Act. . . . Where, however, the words are unimpeached, but are equivocal or ambiguous, declarations of intent by testator or grantor are admissible for the purpose of the *interpretation* of the equivocal or ambiguous language: see Wigmore on Evidence, Vol. IX, . . . sections 2471-2472." Quoted from Lo;·an v. Wiley, 357 Pa. 547, 552, 55 A. 2d 366, 369 (1947). (Emphasis in original.) Beisgen Estate, 387 Pa. 425, 128 A. 2d 52 (1956); Dwight Estate, 389 Pa. 520, 134 A. 2d 45 (1957).

We find on our reading of the testamentary instruments no such ambiguity or equivocation as to justify overthrowing the plain and ordinary meaning of the testator's term "nursing home." See Page on Wills §32.9, (3rd ed.) and cases there cited. The quantum and quality of the estate is clear; the intended beneficiary is clear; the term "nursing home" is clear. Accordingly, this court cannot read "nursing home" as "Methodist Retirement Home" on the strength of the scrivener's testimony as to the testator's direct declarations of intent in regard thereto.

The other evidence introduced upon which this court can construe "nursing home" is the admission by claimant that she and the testator had talked, that the testator was informed of her intent to go into the Methodist Retirement Home, Inc. facility, and that subsequently testator had the

codicil written, using the term "nursing home." It can be contended that this evidence, in combination with the evidence that claimant thereafter attempted to have the codicil rewritten by the testator, is sufficient to support the conclusion that the meaning of "nursing home" is "Methodist Retirement Home." We cannot agree. This evidence in our view is not sufficient to rebut the presumption of ordinary and plain signification.

Accordingly, we turn to the question whether claimant, Mary A. Murphy, actually resided in a "nursing home" on the date of the testator's death. Webster's Third New International Dictionary, Unabridged (1966), defines "nursing home" as a "private hospital" or "a private home or other place where maintenance and personal or nursing care are provided for three or more persons who are unable to care for themselves properly." The Random House Dictionary of the English Language, Unabridged, (Random House 1966) defines "nursing home" as "a private residence or the like equipped to care for persons unable to look after themselves."

At the time of testator's death, Mary A. Murphy was a resident of the Methodist Retirement Home, Inc., in Durham, North Carolina. The relevant North Carolina statute defining "nursing home" for licensing purposes reads as follows:

"Nursing Home Defined.—For the purposes of this section, a 'nursing home' is defined as an institution, however named, which is advertised, announced, or maintained for the express or implied purpose of providing nursing or convalescent care for three or more persons unrelated to the license. A 'nursing home' is a home for chronic or convalescent patients who, on admission, are not as a rule, acutely ill and who do not usually require special

facilities, such as an operating room, X-ray facilities, laboratory facilities, and obstetrical facilities. A 'nursing home' provides care for persons who have remedial ailments or other ailments, for which medical and nursing care is indicated; who, however, are not sick enough to require general hospital care. Nursing care is their primary need, but they will require continuing medical supervision." N.C. Gen. Stat. §130-9(e)(2) (1974)

The relevant Pennsylvania statute defining "nursing home" for licensing purposes reads as follows:

"'Nursing home' means any premises operated for profit in which nursing care and related medical or other health services are provided, for a period exceeding twenty-four hours, for two or more individuals, who are not relatives of the operator, who are not acutely ill and not in need of hospitalization, but who, because of age, illness, disease, injury, convalescence or physical or mental infirmity need such care." Act of June 13, 1967, P.L. 31, 62 P.S. §1001.

From the above definitions and statutes it is clear that the sine qua non, the essence so to speak, of "nursing home" is the provision of "nursing" care or other related medical services on a routine basis to persons unable to care for themselves.

The hearing on this matter produced the following facts. The Methodist Retirement Home, Inc., is a facility that initially provided a residence for retiring Methodist ministers and their families, but is now available to other Christians of retirement age. It accepts only people who do not require medical care or nursing attention. The present residents of

the home live in separate rooms or apartments. Each resident furnishes his own room as he sees fit. There are no hospital beds in the residence and no hospital equipment. The residents are free to come and go as they please. Several of them have employment, which requires them to be away from the residence. All residents are required to take their meals in a common dining hall when they eat on the premises, but residents can, if they desire, eat out, away from the premises.

The retirement home is not licensed as a nursing home under North Carolina law, nor does its corporate charter or bylaws provide for the operation of a nursing home. It is not advertised, announced or maintained for the express or implied purpose of providing nursing or convalescent care. Across the street, separately operated and administered, is a nursing home, sponsored by the same Methodist organization that sponsors the retirement home. The only connection between the two buildings is a passageway under the street, used by maintenance personnel, some of whom are shared by the two buildings. The nursing home has hospital beds for its patients. It is a facility available to the general public as well as to residents of retirement homes, including, among others, the Methodist Retirement Home.

There is no medical or nursing staff at the Methodist Retirement Home. One licensed practical nurse is available during the day for one eight-hour shift. Her duty is to provide such things as aspirin, when residents request such items. She does not provide any scheduled nursing services under the direction of a registered nurse or doctor, for any resident, nor does she look in on, or approach the residents for any nursing purposes. The

residents lock their doors at night, and no one checks on them for any reason.

If a resident becomes sick, private physicians, not connected with the nursing home across the street, are called. These are physicians practicing in Durham, generally volunteers, of the Methodist faith.

The retirement home does not provide nursing care, nor does it have a medical or nursing staff. No nursing programs are accomplished there. It accepts no resident who requires procedures involving nursing skills and techniques or who require comprehensive, planned, nursing care.

Mrs. Murphy herself was in good health when she entered the retirement home. It was obvious to this court that she is alert, in control of her faculties, and able to take care of herself. Her one complaint is an arthritic condition, which she controls with medication prescribed by a personal physician before she entered the home.

Applying the applicable law to the matters set out above, it is obvious that Mrs. Murphy is not a resident of a "nursing home."

Wherefore, this

## DECREE

And now, February 8, 1978, it is hereby ordered and decreed that the personal representative shall forthwith file an amended schedule of distribution in the estate of Albert F. Alexander, also known as A.F. Alexander, deceased, distributing to Mary A. Murphy, decedent's sister, 50 percent out of the residue of said estate, in accordance with this adjudication.

For purposes of appeal, this is a final decree.